# Westerfield v. Prudential Ins. Co. of America et al.

(Decided March 27, 1936.)

A. W. GRAFTON and WOODWARD, DAWSON & HOBSON for appellant.

E. R. ATTKISSON and S. S. Blitz for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

The appellant and plaintiff below, Melvin G. Westerfield, in the year 1930 began serving the appellee and defendant below Prudential Insurance Company of America as a solicitor of life insurance for it within a prescribed district in Louisville, Ky., and also making weekly collections of premiums on nonlapsed policies issued by defendant to persons within his district. The assistant superintendent having charge of that district received the weekly reports of plaintiff, and of others similarly employed under him, and which reports contained newly written insurance for the week covered by the report, as well as collections of weekly premiums made. The record seems to be somewhat confused on the point, but as we interpret it the territory allotted to plaintiff and others similarly employed, together with the book containing the weekly premiums that he should collect and account for, as well as new insurance obtained, was known in the parlance of the company and its employees as "the debit."

At the end of the week terminating on August 1, 1933, more than three years after plaintiff began serving the corporate defendant, he and three associates similarly engaged returned their books to the assistant superintendent and announced their purpose to quit the employment. Plaintiff then acknowledged that he had collected the past week, upon which he was due to make a report, about $150, but the amounts collected by his associates do not appear in the record. They (including plaintiff) were asked by the assistant superintendent at that time to pay over the amount collected, but they declined to do so, and stated at the time, in substance, that because of certain manipulations of defendant's books and certain violations of duty of the assistant superintendent, they had been defrauded, and about which question there seems to have been prior

controversies. They insisted that, because of such wrongful manipulations whereby they were made to account for and pay premiums they had not collected, the company was indebted to them in an amount much larger than the sum demanded of them (and which they admitted possessing) as representing the past week's collections. They stated at the time that upon a proper audit of the books (meaning, of course, after they were corrected so as to conform to the facts), their contention would be found to be correct; but if not, they would then pay over the respective amounts demanded of them, but would not do so without such an investigating audit. They were then and there told they would be given a certain time within which to make payment, and if not done at the expiration thereof they would be prosecuted for embezzlement.

Following that, and on the next day, they consulted an attorney, who seems to have advised them of the correctness of their position and wrote a letter to the company demanding a settlement. Defendant answered that letter, but there was no reply made thereto or, if so, it is not manifested by the record. The books, containing the most material facts with reference to the demanded audit, were the weekly ones furnished by defendant to plaintiff and his associates, and which contained a record of the accounts charged to them and for which they were required to settle. Under the rules of the employment, the canvassers, of which plaintiff was one, were not allowed to indicate thereon the lapse of a policy so that they would no longer be charged with the weekly premium due thereon. Under their employment they were required to report the fact of lapses to the assistant superintendent, and he would make the proper entry theron, as well as the proper report to the compay, whereby such lapsed policies would not be entered upon the next week's book so as to charge the canvasser (as we have concluded to indicate plaintiff) for future premiums thereon. Plaintiff contended that the assistant superintendent had failed to perform his duties in those respects, whereby lapsed policies were continued to show on the weekly books, and for which plaintiff and his associates would be charged at each weekly report thereafter and would be compelled to and did account for such uncollected premiums.

After receiving the letter from the attorney, consulted by plaintiff and associates, the superintendent, of the territory of which plaintiff's district formed a part, wrote to defendant outlining to some extent the facts we have recited, including an account of the resignation of plaintiff and associates and suggesting to the company that they were acting pursuant to a conspiracy to accomplish a wrongful purpose. That was followed by a sort of expert audit of the books turned in at the end of each week by plaintiff as above indicated, and which was made by one of defendant's inspectors, and from it he reported that plaintiff was owing the company about $601. Following that the agents of defendant appeared before the Jefferson county grand jury and procured an indictment against plaintiff, whereby he was accused of feloniously and unlawfully converting to his own use the property of defendant without its consent and with the intention to permanently appropriate it to himself. Upon the trial thereof plaintiff was acquitted and later filed this "malicious prosecution" action against defendant, and its superintendent. In his petition he made the necessary allegations to support such an action and defendant's answer thereto merely denied its material averments. At the close of plaintiff's testimony as given by himself alone, the court sustained defendant's motion for a peremptory instruction in their favor, which was followed by a verdict in accordance therewith, and judgment was rendered dismissing the petition. Plaintiff's motion for a new trial having been overruled, he prosecutes this appeal.

In addition to what we have stated, plaintiff also testified that the live and non-lapsed policies for the weekly premiums with which he was charged, and for the collection of which he was required to account for each week, were indicated by the letter "X" at the appropriate place on the book, but that the lapsed policies—for which, of course, no premiums were collected —were not so indicated; that he, as such canvasser within his territory, had no right to make such indications, but that they were required to be made by his immediate superior, the assistant superintendent. If properly done, the lapsed policies would not be charged to plaintiff the following week on his new book made out for that week. If, however, no lapses were so in-

dicated and the book made it appear that a lapsed policy was in fact a non-lapsed one, then plaintiff would be charged with the premium whether he collected it or not, and that the assistant superintendent's failure to perform his duty in those respects resulted in his being made to account from week to week, over a large period of his entire service, for more money than he had collected, and in that way he and his associates contended that the company upon a final settlement would be indebted to them. No demand was made of plaintiff after the alleged audit of its books for what defendant claims was found to be due it from him, and he never knew of the audit report until after he was indicted. The audit of those books may have been correctly made, if based alone on what appeared in the books from which they were made, but, according to the contention of plaintiff, the assistant superintendent had falsely made entries on them whereby the truth was supressed and falsehood substituted in the place of it, and which, as we have said, was the wrongful and untruthful indication of the letter "X" with reference to lapsed policies, and which falsification was produced by the wrongful act of the assistant superintendent.

Whether or not plaintiff's contention was or is true, is not the question for determination, nor was it the one submitted to the court upon the motion for the sustained peremptory instruction. On the contrary, that question is: Whether or not under the only testimony heard defendant had probable cause to believe plaintiff was guilty of the crime charged in the indictment against him under the outlined facts, and in the circumstances—all of which, or the material portion of which, was made known to the agents of defendant long before any effort was made to indict him.

The particular offense for which defendant's agents indicted plaintiff is the one denounced by section 1358a of the 1930 Edition of our Statutes. It is in all respects similar to the crime of embezzlement—differing only in the one particular, i. e., the character of individual defrauded. Technical embezzlement is not committed unless the owner of the wrongfully appropriated property is a corporation, whilst the crime denounced by section 1358a prescribes no such requirement, and it may be committed whether the wrongfully appropriated property be that of a corporation or of

an individual. Therefore, the crime therein denounced was held by us in the case of Runyon v. Commonwealth, 215 Ky. 689, 286 S. W. 1076, to be included in the one denounced in section 1202 relating to embezzlement. As we have said, essential elements of each are that the accused must not only have lawfully received the money into his custody and failed to account for it to the owner, but he must also have converted it to his own use *with the intent* at the time to fraudulently or feloniously deprive the owner of it, and to so appropriate it to himself. The two facts of his having the property in his possession, and declining to account to the owner therefor, are alone not enough to constitute the offense, although such facts, unexplained and unqualified, would furnish grounds for inferring the necessary intent—the third required element. Those observations are so universally applied as not to require fortifying opinions, or other authority.

The question then recurs: What facts are necessary to be alleged and proved in order to sustain a civil action to recover damages for a malicious prosecution? The answer is, that the prosecutor (defendant in the civil action) must be shown to have acted maliciously and without probable cause in instituting the prosecution; and therefore the plaintiff in such action must allege in his petition that the defendant inaugurated the prosecution maliciously and without probable cause. If they are denied, then plaintiff in order to succeed must sustain them by his proof. Those principles are as well settled and universally applied as the ones above referred to, and for which reason we also deem it unnecessary to support them with adjudged cases or texts. Having said this much, we will now determine the merits of this appeal from the testimony contained in the record.

Plaintiff testified (and he was the only witness introduced) not only to the facts hereinbefore briefly recited (his testimony enlarging and elaborating upon them), but he also repeated instances where at least two assistant superintendents under whom he served had so failed to arrange the weekly lists or books as to charge plaintiff with collections that he had not made and about which he made frequent complaints, until the matter assumed such proportions as that he and his associates determined to quit the service and to re-

tain the past week's collections until a settlement of the controversy could be satisfactorily made. It is true he suggested an audit, but he did not specify the way and manner it should be made. Defendant, as we have said, attempted to make one; but, as we also have seen, it was based upon the books as so fraudulently manipulated in the manner described by plaintiff, and was purely ex parte. Plaintiff also testified that his then assistant superintendent at or about the time of his quitting the service was discharged by defendant for failures in performance of duty. Before voluntarily obtaining plaintiff's indictment, defendant was informed, not only of the nature of plaintiff's complaints, but likewise informed of at least some of the evidence by which he expected to establish them. Moreover, it was also informed before voluntarily procuring the indictment that plaintiff had consulted counsel who advised him of the righteousness of his cause, and that he was acting (at least to some extent) on that advice in declining to turn over his last week's collections. In addition to all of such facts, plaintiff at the time of his resignation, not only admitted the collections he had made, but turned over to defendant the very book that contained indisputable evidence of that fact. He apparently concealed nothing.

Having said this much, the next inquiry is: What facts should the prosecutor possess at the time he makes the accusation in order to produce "probable cause"? The definition of the phrase is substantially the same by all courts and text-writers, notwithstanding it may be found to be differently phrased by different courts. In the case of United Furniture Co. v. Wills, 158 Ky. 806, 166 S. W. 600, 602, we defined it as meaning "such cause as would induce a reasonably prudent person to believe that the plaintiff was guilty of the charge" preferred against him, which in that case was "obtaining goods under false pretenses," and the actual definition as contained in the opinion is: "Probable cause means such cause as would induce a reasonably prudent person to believe that the plaintiff was guilty of the charge of obtaining goods under false pretenses." So that, in applying that definition (which is substantially the one that we have approved in every case brought to this court), it would require defendant herein acting as a reasonably prudent person "to believe that plain-

tiff was guilty of the charge of fraudulently converting its property to his own use without its consent,'' etc., as is denounced by section 1358a, supra. According to what we have said, if defendant at the time it procured the indictment of plaintiff only knew the two facts that he had collected its money and had refused to turn it over or account for it, it, perhaps, would have been justified in acting upon such unqualified facts as constituting probable cause (necessary intent being inferable therefrom) without being required to make inquiry of the accused for further information. See 38 C. J. p. 407, sec. 36. However, that same text in its last sentence qualifies that right by saying: ''When facts or circumstances put him (the prosecutor) upon inquiry, he will be charged with knowledge of such facts as he would have learned if he or his agent authorized to investigate had made a proper investigation into the circumstances of the case.'' The next section (37), on the same page, states another universally established and applied rule in such cases, to the effect that the facts known, or which by proper investigation could have been known, to defendant, in order to constitute probable cause, are those, only, ''which were known to the prosecutor at the time he instituted the prosecution.'' In this case the only proof heard upon the trial tended to show that at that time defendant knew all of the facts hereinbefore recited and which were repeated by plaintiff as the sole witness heard at the trial.

We have seen that the necessary criminal intent must have been entertained by plaintiff in this case before he could be convicted of the crime for which he was indicted. The authorities are in accord on the proposition that, although other necessary elements of the offense are shown, yet if there is an absence of the required intent no crime has been committed. However, as we have seen, such requisite intent may be inferred from the other proven facts in the case. Converseely, if they are sufficient to destroy such an inference, then a failure of proof is produced and the innocence of the accused is thereby manifested. Hence we find the text in 9 R. C. L. 1278, sec. 19, saying at the close thereof: ''If however, appropriation is made upon the belief honestly entertained by the accused that he had lawful title or right to appropriate it, the

act is not criminal; as, for instance, where an agent believes, though mistakenly, that has a claim against his principal, and in good faith undertakes to secure him against loss, he is not guilty of embezzlement.'' The same principle is thus stated in 20 c. J. 436, sec. 21: ''If property is converted without concealment, and under a bona fide claim or right, the conversion is not embezzlement, however unfounded the claim may be.'' A long list of cases in substantiation thereof is cited in note 68 to that text, including those of Dunavant v. Commonwealth, 144 Ky. 210, 137 S. W. 1051, and Taylor v. Commonwealth, 119 Ky. 731, 75 S. W. 244, 25 Ky. Law Rep. 374.

That note occupies three columns, each covering nearly the length of the entire page, and the cases cited therein, with excerpts from some of them, clearly establish the rule to be that the retention of funds by one who acquired the lawful possession of them does render him guilty of embezzlement, or its kindred offense denounced by our section 1358a, supra, of our Statutes, when the reason given for such retention and refusal to pay over is bottomed upon a bona fide belief on the part of the one so refusing that he is rightfully entitled to appropriate the fund because of an equally bona fide belief that his principal is indebted to him to the extent of the amount retained; and that is true although the accused agent might be mistaken in his belief. However, for that principal to operate defensively the belief on the part of the agent that the principal is so indebted to him must be bona fide and based upon facts calculated to generate or inspire it in the mind of a reasonably prudent person.

In this case the only testimony that the court heard revealed facts justifying such a belief on the part of plaintiff, all of which (or the material parts of which) were in possession of defendant before its agents voluntarily appeared before the grand jury and procured his indictment. Certainly that presentation was sufficient to create a prima facie showing of want of probable cause; for, as we have pointed out, if it were true there was in fact no probable cause. It was for the jury to say whether or not it was true, and from which it inevitably follows that the court erred in directing the verdict for defendant. The propositions herein advanced could be enlarged upon and their

accuracy more thoroughly established, but since they are universally accepted we deem it unnecessary to do so.

For the reasons stated the judgment is reversed, with directions to grant the new trial and for proceedings consistent herewith.

The whole court sitting.