## PFUNDER v. COMMONWEALTH.

Court of Appeals of Kentucky.
Oct. 10, 1952.

Earle T. Shoup, W. Pelham McMurry, Paducah, Charles W. Runyan, Marion, for appellant.

J. D. Buckman, Jr., Atty. Gen., Wm. F. Simpson, Asst. Atty. Gen., for appellee.

STANLEY, Commissioner.

We think the evidence of the Commonwealth does not prove criminal conversion of money. It did not prove even a civil breach of trust, and scarcely a breach of an agreement, yet the penalty was fixed at confinement in the penitentiary for a year. It may be observed that the personal attorney of the complaining witness, who was engaged in civil litigation with the defendant, apparently took charge of the prosecution, for he examined or cross-examined every witness.

The indictment charged the appellant, Fred J. Pfunder as an officer of a corporation and as an agent of an individual to have fraudulently and feloniously converted to his own use $5,000 which belonged to Davenport Mines, Incorporated, and John J. Tobin. Though there is a statute covering embezzlement or criminal conversion of funds of a corporation, KRS 434.010, and a different statute of the same character condemning conversion of property of any owner thereof, KRS 434.220, we have held the scope of the latter statute sufficiently broad to embrace funds belonging to a municipal corporation and a tax collector who had a special property interest therein. Commonwealth v. Bain, 240 Ky. 611, 42 S.W.2d 876. The essence or gravamen is criminal intention. Without it there is no offense. Westerfield v. Prudential Insurance Co. of America, 264 Ky. 448, 94 S.W.2d 986; Robinson v. Commonwealth, 311 Ky. 867, 226 S.W.2d 29.

In 1945 the appellant, Pfunder, Anthony Scarpelli, John O'Donnell and others organized a corporation styled "Davenport Mines, Incorporated," for the purpose of mining fluorspar in Crittenden County. Pfunder became president. Within the next four years Pfunder had personally advanced to the corporation more than $600,000, and at the time of the present transactions the company owed him about $160,000 on this account. Scarpelli and other stockholders had also advanced money to the corporation. All of these transactions were shown on the books. Needing additional funds, O'Donnell brought Pfunder, Scarpelli and John Tobin together in St. Louis in October, 1949. O'Donnell recommended the venture to Tobin, and he agreed to let the corporation have $15,000 with the understanding, as he, Scarpelli and O'Donnell testified, that it would be used exclusively to buy high grade ore to

be mixed with a low grade that the company was mining, and in consideration Tobin should receive $1 per ton "royalty" on the ore sold. The parties went to a bank in St. Louis, and Tobin produced $12,000 in currency. They discussed with a bank officer methods of handling the funds. It was agreed that the money should be deposited to the credit of an account designated "Davenport Mines, Inc. Purchase Ore Account," the checks to be drawn thereon to be signed by Pfunder, as president of the company, and countersigned by Tobin. Thus, it was proved that Tobin parted with title and ownership of the money and retained only the right to countersign checks drawn on the account in order that he could see, as he contended, that the money was used for the purpose of buying ore.

The next day a check for $5,000, payable to cash, was drawn for the purpose of buying ore, as Tobin says. Pfunder took custody of the money and he, Tobin, and Scarpelli drove that afternoon to Marion, Kentucky. Arriving after the banks had closed, they went to the home of Pfunder's son, Orville Pfunder. According to Tobin and Scarpelli, the appellant showed the money to his son, telling him what it was for, but did not deliver it to him. They testified Pfunder said on that occasion, "We can't do anything about it today. I will have to take care of it in the morning." According to Pfunder and his son the money was then delivered to Orville to be deposited by him. That this was done is made certain by the fact that the appellant returned that night with Tobin and Scarpelli to St. Louis and that Orville, who was a resident agent of the corporation in Marion, proceeded to disburse the funds the next day or soon thereafter.

The point is made in behalf of the Commonwealth that a person may commit a criminal offense through an agent, the concept being that Orville, as agent of his father, the defendant, converted the money to the use of the father. Granted that under rare and particular circumstances an individual may by this means be guilty of a criminal offense, the rule has absolutely no application here. Orville did not convert the funds of the corporation to the use of his father personally. The greater part of the $5,000 was, in fact, used to pay for ore purchased and the balance to meet the payroll of the corporation and a few small items.

The company had bought two lots of ore for which Pfunder had given his personal checks in payment, the amounts to be credited to him by the company in the usual course of practice. But Pfunder had stopped payment on the checks because a prospective lender of some money lost interest and it was not forthcoming. Orville accompanied the seller of one lot of ore to Elizabethtown where a bank was holding Pfunder's check for $620.52 and redeemed it with part of the $5,000 in cash, taking a receipt therefor. He likewise paid the other seller $2,913.48 and obtained his receipt. He paid demurrage charged on the cars in which this ore had been shipped, which amounted to $60. He paid a few other items and placed the balance of $910 to the credit of the corporation payroll and petty cash accounts. Every dime is accounted for as having been spent for the corporation.

Tobin subsequently deposited an additional $1,000 in the St. Louis bank. Pfunder testified he had given Tobin a note for $13,000 he had put in the venture, and he is supported by the secretary of the corporation and two apparently disinterested witnesses who lived in Illinois and who testified Tobin, on separate occasions, had told them he had Pfunder's note "but it wasn't worth a damn." The St. Louis account shows other withdrawals and credits, apparently for the purchase and from the sale of ore. It is shown that Tobin received $500 in "royalty" and a check for an additional $150 which was not paid, all being for ore, including that which the greater part of the $5,000 was used to buy. After these transactions, Pfunder filed a suit in United States District Court against O'Donnell, Scarpelli and others seeking a declaration of rights and an accounting. Apparently it was this litigation that induced the prosecution.

The trial court should have directed a verdict of acquittal. It is not necessary to consider several errors occurring during the trial, both in the admission of evidence and instructions to the jury.

Judgment reversed.